**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JACK MENDELSOHN,<br><br>Plaintiff,<br><br>v.<br><br>ENABLE MIDSTREAM PARTNERS, LP, RODNEY J. SAILOR, LUKE R. CORBETT, ROBERT G. GWIN, ALAN N. HARRIS, RONNIE K. IRANI, PETER H. KIND, SEAN TRAUSCHKE, and R. A. WALKER,<br><br>Defendants. | Case No. ______________<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, Jack Mendelsohn ("Plaintiff"), by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This is an action brought by Plaintiff against Enable Midstream Partners, LP ("Enable" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Enable, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) and Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed merger between Energy Transfer LP ("Energy Transfer"), Elk Merger Sub LLC, a direct wholly owned subsidiary of Energy Transfer ("Merger Sub"), Elk General Partner Merger Sub LLC, a direct wholly owned subsidiary of Energy Transfer ("GP Merger Sub" and together with Merger Sub, the "Merger Subs"), and Enable GP, LLC, the sole general partner of Enable ("General

Partner") (the "Proposed Merger").

2. On February 16, 2021, Enable entered into an agreement and plan of merger with Energy Transfer, Merger Subs, and its General Partner (the "Merger Agreement"), whereby, through a series of transactions, Enable will become a wholly owned subsidiary of Energy Transfer. The Enable Conflicts Committee, consisting of Individual Defendants Robert G. Gwin, Peter H. Kind, and Sean Trauschke (the "Conflicts Committee"), approved the Merger Agreement, and recommended that the Board recommend approval of the Merger Agreement to Enable's common unitholders.

3. Upon consummation of the Proposed Merger, Enable's common unitholders will receive 0.8595 ET common units for each Enable common unit, an exchange ratio that represents an at-the-market transaction, based on the 10-day volume-weighted average price of ET and Enable common units on February 12, 2021 (the "LP Consideration"). In addition, each outstanding Enable Series A preferred unit will be exchanged for 0.0265 Series G preferred units of Energy Transfer, and will include a $10 million cash payment for Enable's general partner (the "GP Consideration" together with the LP Consideration, the "Merger Consideration").

4. On March 19, 2021, in order to convince Enable Common unitholders to vote in favor of the Proposed Merger, the Defendants authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "Registration Statement") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. In particular, the Registration Statement contains materially incomplete and misleading information concerning: (i) the financial projections for the Company and Energy Transfer; and (ii) the valuation analyses performed by the Company's financial advisor, Intrepid Partners, LLC ("Intrepid") and the General Partner's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs" together with Intrepid, the "Financial Advisors"); (iii) Intrepid's relationship over the past two years with CenterPoint Energy, Inc. ("CenterPoint") and OGE Energy Corp. ("OGE

Energy" and, together with CenterPoint, the "Sponsors"); and (iv) the value of the GP Consideration.

6. The Proposed Merger is expected to close expect to complete the Merger in mid-2021, so the special meeting of Enable's common unitholders to vote on the Proposed Merger will be scheduled in the coming weeks (the "Unitholder Vote"). Therefore, it is imperative that the material information that has been omitted from the Registration Statement be disclosed prior to the Unitholder Vote, so Enable's common unitholders can properly exercise their corporate voting rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger, unless and until the material information discussed below is disclosed to Enable's common unitholders sufficiently in advance of the upcoming Unitholder Vote or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United

States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Enable's Common Units trade on the New York Stock Exchange ("NYSE"), which is headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases). Further, the Company's and the General Partner's legal and financial advisors maintain their headquarters in this District.

## PARTIES

11. Plaintiff Jack Mendelsohn is, and has been continuously throughout all times relevant hereto, the owner of Enable common units.

12. Defendant Enable Midstream Partners, LP is a public company incorporated under the laws of Delaware with principal executive offices located at 499 W. Sheridan, Suite 1500, Oklahoma City, OK, 73102. Enable's Common Units are traded on the NYSE under the ticker symbol "ENBL".

13. Individual Defendant Rodney J. Sailor is, and has been at all relevant times, a director of the Company, President, and Chief Executive Officer.

14. Individual Defendant Luke R. Corbett is, and has been at all relevant times, a director of the Company.

15. Individual Defendant Robert G. Gwin is, and has been at all relevant times, a director of the Company.

16. Individual Defendant Alan N. Harris is, and has been at all relevant times, a director of the Company.

17. Individual Defendant Ronnie K. Irani is, and has been at all relevant times, a director of the Company.

18. Individual Defendant Peter H. Kind is, and has been at all relevant times, a director of the Company and Chairman of the Enable Conflicts Committee.

19. Individual Defendant Sean Trauschke is, and has been at all relevant times, a director of the Company.

20. Individual Defendant R. A. Walker is, and has been at all relevant times, a director of the Company.

21. The defendants identified in paragraphs 13 through 20 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Enable, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Company and the Proposed Merger

22. Enable Midstream Partners, LP owns, operates, and develops midstream energy infrastructure assets in the United States. As of December 31, 2020, it had a portfolio of midstream energy infrastructure assets included approximately 14,000 miles of gathering pipelines; 15 processing plants with 2.6 billion cubic feet per day of processing capacity; approximately 7,800 miles of interstate pipelines; approximately 2,200 miles of intrastate pipelines; and 7 natural gas storage facilities with 84.5 billion cubic feet of storage capacity. The company was founded in 2013 and is based in Oklahoma City, Oklahoma.

23. Energy Transfer LP provides energy-related services. The company owns and operates approximately 9,400 miles of natural gas transportation pipelines and three natural gas storage facilities in Texas; and 12,340 miles of interstate natural gas pipelines. Energy Transfer LP was founded in 1996 and is headquartered in Dallas, Texas.

24. According to the February 17, 2021 joint press release announcing the Proposed Merger:

**ENERGY TRANSFER TO ACQUIRE ENABLE MIDSTREAM IN $7 BILLION ALL-EQUITY TRANSACTION**

DALLAS & OKLAHOMA CITY--(BUSINESS WIRE)--Feb. 17, 2021-- Energy Transfer LP (NYSE: ET) ("ET" or "Energy Transfer") and Enable Midstream Partners, LP (NYSE: ENBL) ("Enable") today announced that they have entered into a definitive merger agreement whereby Energy Transfer will acquire Enable in an all-equity transaction valued at approximately $7.2 billion. Under the terms of the agreement, Enable common unitholders will receive 0.8595 ET common units for each Enable common unit, an exchange ratio that represents an at-the-market transaction, based on the 10-day volume-weighted average price of ET and Enable common units on February 12, 2021. In addition, each outstanding Enable Series A preferred unit will be exchanged for 0.0265 Series G preferred units of Energy Transfer. The transaction will include a $10 million cash payment for Enable's general partner.

**Positive Financial Impact**

The transaction furthers Energy Transfer's deleveraging efforts as it is expected to be immediately accretive to free cash flow post-distributions, have a positive impact on credit metrics and add significant fee-based cash flows from fixed-fee contracts.

The all-equity nature of the transaction allows unitholders of both partnerships to participate in the value creation potential of the combined partnership.

**Complementary Assets**

Energy Transfer's acquisition of Enable will increase Energy Transfer's footprint across multiple regions and provide increased connectivity for Energy Transfer's natural gas and NGL transportation businesses.

Energy Transfer will significantly strengthen its NGL infrastructure by adding natural gas gathering and processing assets in the Anadarko Basin in Oklahoma and integrate high-quality assets with Energy Transfer's existing NGL transportation and fractionation assets on the U.S. Gulf Coast. The acquisition will also provide significant gas gathering and processing assets in the Arkoma basin across Oklahoma and Arkansas, as well as the Haynesville Shale in East Texas and North Louisiana.

Enable's transportation and storage assets enhance Energy Transfer's access to core markets with consistent sources of demand and bolster its portfolio of customers anchored by large, investment-grade customers with firm, long-term contracts. Energy Transfer will further enhance its connectivity to the global LNG market and the growing global demand for natural gas as the world transitions to cleaner power and fuel sources.

**Synergies**

The combination of Energy Transfer's significant infrastructure with Enable's

> complementary assets will allow the combined company to pursue additional commercial opportunities and achieve cost savings while enhancing Energy Transfer's ability to serve customers.
>
> Energy Transfer expects the combined company to generate more than $100 million of annual run-rate cost and efficiency synergies, excluding potential financial and commercial synergies. Potential commercial synergies include significant incremental earnings, which may result from integrating Enable's Anadarko gathering and processing complex with Energy Transfer's fractionation assets on the U.S. Gulf Coast.

25. The LP Consideration represents inadequate compensation for Enable's common units. The fact that the LP Merger Consideration has an implied value per unit of Enable common units of $5.86, based on the closing price of Energy Transfer common units as of February 12, 2021 (the last trading day prior to the approval of the merger agreement), and represents a ***negative premium of 2.73%***. That is to say that common unitholders could have sold their units for greater consideration than is being offered for consideration.

26. The fact the Board agreed to this egregious consideration is only because the Sponsors will receive unique consideration in the deal. Indeed, each outstanding Enable Series A preferred unit will be exchanged for 0.0265 Series G preferred units of Energy Transfer and will include a $10 million cash payment for the General Partner. Yet, as described below, the Registration Statement is silent as to the value that is being exchanged in the Series G preferred units. It is imperative that Enable Unitholders receive the material information (discussed in detail below) that Defendants have omitted from the Registration Statement, which is necessary for Unitholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Merger.

**B. The Registration Statement Omits Material Information**

27. On March 19, 2021, Defendants filed a materially incomplete and misleading Registration Statement with the SEC. The Unitholder Vote on the Proposed Merger is forthcoming. The Individual Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's Unitholders to ensure that it did not

contain any material misrepresentations or omissions. However, the Registration Statement misrepresents or omits material information that is necessary for the Company's Unitholders to make an informed voting decision in connection with the Proposed Merger, and thus the Registration Statement should be amended.

28. ***First***, the Registration Statement omits the projections for 2021 to 2025 Net Income for Enable and 2021 to 2023 for Energy Transfer (the "Net Income Projections"). Net Income is often considered one the most comparable metrics to those utilizing Generally Accepted Accounting Principles ("GAAP"), an accounting standard that ensures financial information is prepared on a reasonable basis. The inclusion of Net Income is therefore necessary for Enable's Unitholders to ensure that the Merger Consideration is premised on projections that were reasonably prepared. The failure to disclose the Net Income Projections also obfuscates the financial picture of both companies and provides a misleadingly incomplete representation of the projections tables and valuation analyses summarized in the Registration Statement.

29. As Regulation S-K of the SEC explains, when disclosing revenue (as was done here), it should be disclosed together with net income to prevent a misleading representation of corporate value:

> Although traditionally projections have been given for three financial items generally considered to be of primary importance to investors (revenues, net income (loss) and earnings (loss) per share), projection information need not necessarily be limited to these three items. However, management should take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items. Revenues, net income (loss) and earnings (loss) per share usually are presented together in order to avoid any misleading inferences that may arise when the individual items reflect contradictory trends.

17 C.F.R. § 229.10(b)(1); see also 17 C.F.R. § 244.100 (regarding disclosure of non-GAAP financial measures). Moreover, when a company chooses to disclose financial projections, it obligates itself to do so in a complete and accurate manner, and it may not cherry-pick certain metrics to disclose while withholding other readily available sets of projections from Unitholders. *See Campbell v.*

*Transgenomic, Inc.*, 916 F.3d 1121, 1125 (8th Cir. 2019) ("The disclosure of [the company's] net income/loss figures could have significantly altered the total mix by informing shareholders about pre-merger [the company]'s net income/loss."); *see also Smith v. Robbins & Myers*, 969 F. Supp. 2d 850, 874 (S.D. Ohio 2013) ("[I]f a Proxy discloses valuation information, it must be complete and accurate"). Accordingly, the Net Income Projections must be disclosed.

30. ***Second***, the Company must disclose line-item projections underlying the calculation of Cash Flow projections on pages 80 to 83 of the Registration Statement. In selectively disclosing certain metrics to Unitholders, the Board has chosen to blindfold Unitholders to fundamental valuation information—given to its financial advisor—and instead, left Unitholders out in the dark with only market data for guidance. In order to correct these material omissions, to the extent the data is readily available and up to the years created, Defendants must disclose: (i) Stock-based Compensation; (ii) Net Debt; and (iv) Dividends. Failure to do so will result in Unitholders not having all material information available, and should the merger be consummated, will cause Unitholders to lose the intrinsic value of their units.

31. ***Third***, as disclosed in the Registration Statement, Enable management provided to the General Partner Board a *pro forma* financial forecast prepared by Enable management based on the proposed exchange ratio for the Merger, the Energy Transfer adjusted financial forecast and the Enable financial forecast. Representatives of Goldman Sachs discussed with the Enable General Partner Board its preliminary financial analyses regarding Enable on a stand-alone basis, as well as on a pro forma basis for the transaction with Energy Transfer. However, the *pro forma* financial forecast is omitted from the Registration Statement, this too must be disclosed. As stated above, financial forecasts are of special importance to Unitholders in order to assess the value of their units, and in this case, to assess the value of their units post-merger.

32. ***Fourth***, the Registration Statement describes Intrepid's and Goldman Sachs fairness

opinions and valuation analyses performed in support of their opinions yet omits important inputs and assumptions that Intrepid utilized in their calculations. Defendants concede the materiality of this information in citing Intrepid's and Goldman Sachs' fairness opinions and their valuation analyses among the reasons for recommending the merger to Enable Unitholders. Without this information, as described below, Enable's Unitholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on the fairness opinions in deciding whether to vote in favor of the Proposed Merger. The following omitted information, if disclosed, would significantly alter the total mix of information available to Enable's Unitholders.

33. In summarizing Goldman Sachs' *Illustrative Unlevered Discounted Cash Flow Analysis—Enable*, the Registration Statement fails to disclose: (i) the assumptions for selecting discount rates ranging from 8.0% to 9.5%; (ii) Enable's estimated WACC; (iii) the range of terminal values; (iv) the basis for selecting perpetuity growth rates ranging from (2.1)% to 0.5%; (v) the reasons for utilizing CAPM; and (vi) the CAPM inputs including Enable's target capital structure weightings, the cost of preferred equity, the cost of debt and a beta for Enable.

34. With respect to Goldman Sachs' *Illustrative Present Value of Future Unit Price Analysis—Enable*, the Registration Statement fails to disclose: (i) the basis for selecting a discount rate of 10.5%; (ii) the reasons for utilizing CAPM; and (iii) the CAPM inputs including Enable's target capital structure weightings, the cost of preferred equity, the cost of debt and a beta for Enable.

35. With respect to Goldman Sachs' *Illustrative Present Value of Future Unit Price Analysis—Pro Forma Energy Transfer*, the Registration Statement fails to disclose: (i) the basis for selecting a discount rate of 8.0%; (ii) the reasons for utilizing CAPM; (iii) the CAPM inputs including Enable's target capital structure weightings, the cost of preferred equity, the cost of debt and a beta for Enable; and (iv) the *pro forma* projections utilized in the analysis.

36. In summarizing Intrepid's *Comparable Company Trading Analysis*, Defendants

must disclose the inputs of the individual companies and metrics observed by Intrepid. The Registration Statement fails to disclose the companies selected and the individual metrics for each company, so that Unitholders are unable to understand whether these companies were reasonably selected or were selected in order to arrive at fairness.

37. With respect to Intrepid's *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose: (i) terminal value for the Company; (ii) the basis for applying a WACC range of 7.3% to 9.0%; (iii) the discount rate range; and (iv) all other company specific inputs such as the Company's target capital structure weightings, the cost of long-term debt, after-tax yield on permanent excess cash, if any, future applicable marginal cash tax rate and beta.

38. With respect to Intrepid's *Precedent Transactions Analysis*, the Registration Statement fails to disclose the transactions selected and the individual metrics for each transaction, so that Unitholders are unable to understand whether these companies were reasonably selected or were selected in order to arrive at fairness.

39. Similarly, the Registration Statement omits the above information for Intrepid's analysis of Energy Transfer. Considering that Unitholders are being asked to exchange their units in Enable for units in a pro forma company including Energy Transfer, this information is material for them to understand if the Exchange Ratio is fair. Accordingly, this too must be disclosed.

40. These key inputs are material to the Company's Unitholders, and their omission renders the summary of the Financial Advisors' financial analyses incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in financial analyses a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, FAIRNESS OPINIONS, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….*This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* ***unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, the Company's Unitholders cannot evaluate for themselves the reliability of the Financial Advisors' financial analyses, make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company or were the result of an unreasonable judgment by the Financial Advisors, and make an informed decision regarding whether to vote in favor of the Proposed Merger.

41. ***Fifth***, The Registration Statement omits material information necessary for Intrepid's prior and/or ongoing relationship with the Sponsors presently and during the past two years. These omissions fly in the face of the disclosure requirements of the Exchange Act and mislead shareholders as to the nature of Intrepid's relationship with the Sponsors and Enable the conflicts of interests that Intrepid faces. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

42. ***Sixth***, Registration Statement fails to identify the value of GP Consideration. Indeed, the Registration Statement is silent as to the value that is being exchanged in the Series G preferred units. Considering that Unitholders are being asked to exchange their shares for a ***negative premium***, certainly the value of the consideration unique to the Sponsors would alter the 'total' mix of information and so must be disclosed.

43. In sum, the omission of the above-referenced information renders the Registration Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming Unitholder Vote concerning the Proposed Merger, Plaintiff will be unable to make an informed decision regarding whether to vote his units in favor of the Proposed Merger, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

44. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

45. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Registration Statement or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

46. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Registration Statement communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

47. The omission of information from a Registration Statement will violate Section 14(a)

and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

48. Defendants have issued the Registration Statement with the intention of soliciting the Company's Public Unitholders' support for the Proposed Merger. Each of the Individual Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding, amongst other things: (i) the financial projections for the Company and Energy Transfer; and (ii) the valuation analyses performed by the Financial Advisors in support of its fairness opinion.

49. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to the Company's Unitholders although they could have done so without extraordinary effort.

50. The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Registration Statement states that the Financial Advisors reviewed and discussed their financial analyses with the Individual Defendants, and further states that the Individual Defendants considered the financial analyses provided by the Financial Advisors, as well as their fairness opinions and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the

Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Financial Advisors as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

51. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

52. Enable is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

53. The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Unitholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

54. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55. The Individual Defendants acted as controlling persons of Enable within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Enable, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

56. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

58. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger

Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

59. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

60. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

61. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Unitholder Vote or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 23, 2021

**MONTEVERDE & ASSOCIATES PC**

By: *<u>/s/ Juan E. Monteverde</u>*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*